The last case of the afternoon, orally argued, is Number 14-10403, O.M.G. v. Heritage Auctions. So we'll hear from Mr. Baer. Thank you, Your Honor, and may it please the Court. My name is Mark Baer. I represent the appellant, Heritage Auctions. This is another one of those arbitration cases where I believe the district court has failed to give appropriate deference to the arbitrator's award. There are two issues I hope to discuss with the panel this afternoon. The first is, the arbitrator did exactly what he was supposed to do, both procedurally and as a matter of substance. And second, his award was within the authority he had, both through the arbitration clause agreed to by the parties and never challenged by either party, and by the submission of the issues of the case to him, or in other words, as I sometimes refer to it, trial by consent. So starting with what he actually did procedurally, he had an eight-day hearing. He allowed both sides equal time. He allowed the appellee four lawyers, all with a speaking role. He had pre-hearing briefing, he had post-hearing briefing. And he ultimately— I don't think this is a general attack on the procedure. I think this is simply whether the arbitrator could decide that the whole contract was essentially canceled and thereby seemingly make himself disappear. There is a claim of procedural misconduct, and that's why— Well, I mean, I think that's a way to get to this point. I mean, in other words, the A-4 is a way to get to this point. I don't know that they're saying he didn't have enough days of hearings or something like that. I didn't get that anyway. If they made that argument, I missed it because it sounded like there were plenty of days. It's a small point, and I think it was a not-well-taken point, but I wanted to dismiss that right off the bat. So let's talk about what he actually did. He actually interpreted the contract exactly the way he's supposed to do. Let me ask you this. Was there ever any contention that the parties didn't agree to arbitration in this contract? Never. I mean, in other words, I realize there was a question about ambiguity, and so meeting of the minds on section something else, but on section arbitration, was there any argument that we didn't mean that provision, we didn't have a meeting of minds on that provision? Never. Not once. And there were multiple opportunities to raise that point. There was the opportunity to raise it in the answer to the demand for arbitration, and the amended answer, and the second amended answer, and at the hearing, and in the briefing where they actually briefed the issue of meeting of the minds and termination of the contract. And in fact, at the end of the hearing, after these eight days, the arbitrator turned to the lawyers on the other side and said, I think that meeting of the minds is an issue in this case. You're not claiming that you're not going to have fair notice of that, are you? And all four of them stood there mute. There was never a challenge until after the ruling went against them. Well, because what I'm thinking is that the parties could have, you know, you have a contract that has, say, ten paragraphs, and we could all agree on D, which is the arbitration paragraph, that we don't want to be in court. Man, we don't like court. We want to be in front of an arbitrator, and then we just can't agree on anything else. And in that case, couldn't you still go to arbitration, even if the whole rest of the contract's a mess? No. And you're raising the point that the Supreme Court made in Prima Pena, that the arbitration clause is severable from the rest of the contract. And I thought that was the law, really, until you guys started arguing about it, that you can't – if the arbitration clause is being attacked, then that's for the court. But if the overall contract's what's being attacked, then that's for the arbitrator. That is exactly our position, Your Honor, that the arbitration clause was severable. No one ever complained about the arbitration clause until after the award went against OMG. And at that point, they raised the problem. Was the thrust of your client's argument the no meeting of the minds? Was that the thrust throughout the whole procedure, or were you talking about definitions of merchandise? What was the main thrust of the whole? It was an alternative theory, but it was well-discussed during the course of the arbitration hearing. We contended in our demand for arbitration that if the contract was ambiguous, then therefore we contended there was no meeting of the minds and the contract should be rescinded. And so during the course of the arbitration hearing, we established through OMG's witnesses that they conceded that there were ships passing in the night. They conceded that there was no meeting of the minds on this issue of whether or not they had to procure the merchandise in order to get paid the commission. You know, I'll tell you what really troubles me about this case is that the same law firm that drafted a 95-page contract is the law firm that's saying there was no meeting of the minds and therefore no contract. I don't understand that. Well, Your Honor, as a matter of fact, there's a contractual clause that specifically addresses that where it's paragraph 23 of the contract that says the parties acknowledge that all the parties had an opportunity for their counsel to participate and no rule of construction shall apply to this agreement that construes ambiguous or unclear language in favor of any party. Also, during— I don't even understand quite what that language means. I thought the normal solution to an ambiguity in a contract was to interpret the contract through extrinsic evidence and then resolve the ambiguity. Well, that's what the arbitrator tried to do. He first determined there was an ambiguity, which I don't think either party contests. I do, but that's neither here nor there at this point. In fact, the appellee on—I believe it's page 11 of their brief refers to it as an ambiguous contract, so I think they concede it's ambiguous. So then, if you read the arbitrator's award, the second thing he does is look at extrinsic evidence to try to resolve this ambiguity, and he considers the testimony I related to Judge Crone. So, in other words, so can the argument be made that this very well-respected law firm in Dallas drafted a contract with an automatic out clause, known mainly to themselves? Well, that would assume that the well-known law firm knew or realized that the parties were passing—were talking past each other. I don't negotiate for two months and have 90—I mean, my husband's a transactional lawyer. I haven't talked to him about this case, but we've been married 40 years, and it just dumbfounds me. Well, no more than it dumbfounds us that the business people, these very experienced business people, unknowingly were talking past each other. And by the way, there was never any allegation in the hearing by anyone that there was a ambiguity known to one and not the other, or that this was some kind of manipulation. I think the parties both acknowledged they were talking past each other, that one had one meaning in his head, the other had a different meaning in his head. And so I don't think there was anything nefarious going on here. It was a latent ambiguity that never really came up until after several months, because the initial auction that was held was of merchandise that it was clear that OMG had procured, and so therefore there was no doubt they were owed a commission. They were paid a commission. Heritage Auctions got its share of the commission, too. Everybody was happy. It wasn't until OMG stopped operating, stopped procuring merchandise, that the parties became aware that they had totally missed each other and misunderstood each other and talked past each other. So I don't think there's anything nefarious here, Your Honor. I just think nobody realized it until after the fact. I think the arbitrator tried to deal with that fact. He tried to look at the extrinsic evidence to determine what the parties meant, and he concluded that there was no non-arbitrary way to resolve the ambiguity. Well, I mean, one of the key problems with arbitration is it's essentially unreviewable what you're just talking about, which is your contention that the arbitrator was sort of correct on the merits. If the arbitrator had the power to cancel the contract, then even if we really disagree with that, I mean, I think that's the problem with arbitration is it doesn't really matter what the courts think. It's the problem, but it's also the benefit. The parties are trying— In theory. But we seem to get a lot of these motions to vacate. So I guess we don't see that. We don't see the—it's like the doctor doesn't see people who are healthy. We don't see the happy arbitrator-traded people. We only see the unhappy people, and they come in here and say the arbitrator messed up. But I think that's the point of the BNS— These guys are saying he messed up and didn't have the authority to mess up, and that we can review. So then that's, to me, the focus. And Your Honor, two points on that. First, the BNSF case, I think, addresses that. It's the opinion from about a month ago, where the arbitrator's job is to try to interpret the contract, and it doesn't matter if he or she gets it right or wrong. It doesn't matter if it's erroneous or clearly erroneous. Yeah, but your point is you interpreted yourself right out of a job is what they're saying to the arbitrator. But that brings us back to the Prima Pant case we were talking about, where it's severable, and therefore, you don't eat your own jurisdiction, and I think that's where we are right now. As I pointed out, this issue was tried by consent. This whole rescission issue was tried by consent. Now, they say, well, the word cancellation was never used, and I want to address that. It's true. But cancellation, that word, I don't think, passed anyone's lips. What's the difference? Well, really, the only difference, Your Honor, is that cancellation is prospective, and rescission is retrospective, so it goes back to when the contract was initially formed. So it's actually a lesser remedy, a more limited remedy. It looked to me as if this was actually pretty close to rescission, because OMG got back the intellectual property in the name, evidently, and the only thing that changed, I believe, was the amount of money owed for the one auction. That's right, and the arbitrator allowed them to keep the commissions they earned as a result of procuring the merchandise, and they allowed Heritage to keep its share, and then going forward, he cut the sheets and let the parties go on their separate way. And so I think that was the appropriate remedy. I think that's what a judge would do, faced with a— What were you asking for as a remedy? Well, initially, we were asking as a remedy that the arbitrator find that the contract should be read the way we read it, which was that OMG had to procure merchandise in order to be paid. In the alternative, we asked for rescission. We asked him to find that there had been no meeting of the minds on this issue, and that the parties should go their separate way. We thought we should be able to keep the name that we paid for. The arbitrator decided to let them have the name back, and we're not complaining about that. He let the parties go off on their separate way, having been paid for the performance up to that point. I think that was within his authority, because the term of the arbitration clause allowed him to make that decision, particularly since it incorporated the AAA commercial rules, which specifically give an arbitrator the authority to decide whether or not a contract is enforceable. I understand, Prima Paine, and I understand the argument you're making. What does leave me in some doubt is the juxtaposition of the Buckeye check cashing case with the Granite Rock, and Granite Rock being the more recent case, and saying that the date of formation is a foundational issue that has to be presented to the court. I agree with your statement of the holding of the case, and I think that that is one of those gateway cases that get raised initially in the case. Gateway is your word, but it's not the Supreme Court's word, is it? No, that's fair. That's how we describe the cases that relate to things like, is the contract in effect? Has the contract been signed? Has it been signed with authority? We call those gateway cases, and I agree. That is our word. That doesn't ... That really ... If you have a broad arbitration clause, that leaves very little room for courts to declare, and a lot of room for arbitrators, I suppose. No, I think that's right, and that's the purpose of arbitration. Arbitration, of course, is a creature of contract, and so the parties can contract to have the way they want. But that's true post-dispute as well. So if they came into this and tried it by consent, as you call it, even if the original clause is somehow lacking, the consent can supply ... I mean, you don't have to agree to arbitration in advance of a dispute. You can agree to it after a dispute. Absolutely. There doesn't have to be an arbitration clause at all. The parties can just agree after the fact. You're exactly right. What's weird to me is, I mean, I'm used to people running into court trying to avoid arbitration before it happens, and their whole argument is, we don't want to go through a huge arbitration only to find out we shouldn't have had it. So these disputes, everybody knows where the courthouse is. That's all I'll say. That's what should have happened. They found me back in the day, and they're continuing to find judges now. And that's what OMG should have done. If they thought the arbitrator didn't have the authority to consider this rescission meeting of the minds issue, they should have raised that at the very outset, and they didn't. They waived it. They walked into this hearing, they spent eight days arguing this case, and it wasn't until they lost that they asked for a do-over. And so with that, I'll sit down. Thank you, Your Honor. Unless there are any other questions? Not at the moment. Thank you. Thank you. Mr. Main. Good afternoon, Your Honor. Stephen Main, appearing on behalf of the plaintiffs here, the three plaintiffs. We'll call, for the sake of convenience, the Martin parties, if I may. The core issue in this case was not spoken to by counsel for Heritage. The core issue in this case is whether an arbitrator whose sole source of authority is an arbitration clause in a contract that the arbitrator rules, and the arbitrator rules of the contract was never formed, that is, never came into existence. What happens? Well, but there's a second source of authority, and that is your consent, your post-dispute consent to the arbitration by proceeding with the arbitration without objecting to his authority to decide the rescission question. I have much to say on that issue. There was absolutely no consent, no waiver here. Understand— You're not going to object to his authority? You didn't file a lawsuit? There's no objection. So you understand. You participated in the arbitration, which a lot of people don't. I mean, you got a lot of people kicking and screaming about arbitration, so y'all are smart fellows and know how to do that, and didn't do it, and therefore, why isn't that consent? Consent, the question of cancellation of the contract was not underlined, not at issue in the arbitration, never, never. The heritage parties filed a complaint for damages under the contract. But they also sought rescission, and the judge actually granted, back to lesser-included offense, a lesser-included remedy, if you will, by just saying kind of go hence without day, everybody. Rescission is vastly different from—there has to be a contract to rescind. When you say a contract was never formed, there's nothing to rescind. The claim— Yeah, but the claim is based on mutual mistake, which is essentially what he's saying here. No. I beg to differ. He's essentially saying there's no meeting of the minds, which is what mutual mistake is. A mutual mistake has two different categories, and in fact, in that regard, there's a mutual mistake that could go to the essence of the agreement. Let's tie this in. This is not mistake. I think this is ambiguity because you're talking about the interpretation of a term within the contract. It's either a patent ambiguity or a latent ambiguity, and if it's—I forget which one it is, but I think if it's the patent ambiguity, that can lead to no meeting of the minds, which means no contract. Actually, it's the other way around. Backwards. The latent ambiguity is when the objective words are clear, the good ship peerless. Right. But there's extrinsic evidence that shows that there wasn't. That is the latent ambiguity. Patent ambiguities— That wasn't what this case was about. It was patent ambiguities, and that's what the arbitrator said was involved here. If you look at his award, he said there were two areas of dispute. The definition of firearms-related merchandise was one, and number two, whether the commission fee, which was a five-year term with a cap of $4.9 million, $4.9 million cap, would apply to goods that were sold by Heritage in the firearms and firearms-related area, or whether Martin had to procure the goods that were sold at auction in order to earn his commission. It is very important to understand that there are firm bookends within, in this case, within which a party theoretically could have said, hmm, there was no mutual of the meetings of the minds, and I want rescission. The problem here is that the arbitrator says, I can't give rescission. And the reason is the structure of the agreement. It is important to understand that what you heard counsel for Heritage talk about was one of two agreements. Importantly, they filed for damages, and they, as an alternative, sought rescission for if there was, on the grounds of no meeting of the minds, with respect to the consulting agreement that had the compensation elements in it. There was another agreement here, the asset purchase agreement. This was structured as an earn-out. I'm selling you my business today, I'm transferring you my 20,000-name customer list, I'm giving you the right to use my name, I'm assigning you my intellectual property, I'm allowing you to now market yourself with the benefit of the historic record that I, Martin, have achieved in the sale of antiques, arms, and armor, record gun prices. He is the major player in this industry. He transfers all that as the front end of an earn-out, in a transactional sense. The compensation side is in the consulting agreement. Isn't it interesting that as arbitrator Reneker acknowledged, they filed no suit, no suit to rescind the asset purchase agreement, because they were quite content to have the assets, the 20,000-name customer list, the Martin name, the intellectual property associated with that. They decided, they came up with this game, called a mutual mistake, so they could escape, they hoped, their obligations to pay for it. Okay, but he didn't let them do that. What? He gave the stuff back. Oh, no, if I, I, I would not, I would not agree with that. What did, what went on? I did not agree with that. No, no, what happened was... What is Heritage still using of your guys? Today? No, nothing. Okay. But the point is, by the time this came to fruition, understand what had happened. Because of his reputation, Martin had lined up the sale, call, of the fine sale of a very important collection of guns in New York. He got paid commission on those, the fine and the Kelly sale, right? Your client got paid commission on the fine and the Kelly sale. That's the point. There was substantial performance of this contract. This is not a contract that was rescinded at, you know... Okay, but what is the, what is the trier of fact or law, whoever they may be, supposed to do with a situation where parties have done something for a while, and now we have to be going forward, and you cannot figure out what they meant going forward? You send it to a jury. Yeah, it goes, well, first of all... Why isn't the arbitrator the trier of fact on that? Because that's not... I'm going to put you back where you were. That's not where the party's agreement is, Your Honor. That's not where the party's agreement are. What we agreed, it's a matter of contract. The law, granted, will drill. Bank one, by the way, bank one is another case that says arbitrators have no, underline no authority to resolve questions of contract performance, full stop. They didn't even mention bank one. Out of this circuit, in that decision, will drill out of this circuit. They didn't... And then you have the Texas Supreme Court in total alignment with, granted, will drill, bank one. Four cases, all saying the arbitrator does not have the power, under the arbitration agreement, to resolve the question of whether a contract is performed. So Heritage knows that. So what they're trying to do is conflate a request for rescission, which requires restitution. They're now saying, well, we were on notice that the contract formation was a challenge. No, it isn't. In order to rescind a contract, which is a remedy at law, you have to have a contract in the first place. That's not what happened here. That's how you would reconcile a case that claimed fraud? That there was a contract, but it's void for fraud? Absolutely. And what do you say about the Colfax case, the Seventh Circuit? I'm happy to discuss. Sachs, if I might, well, if you would indulge me for a second. I want to get to Colfax, absolutely. It is important to note, as a lead into Colfax, remember I mentioned that the arbitrator found that the two provisions at issue were not latent ambiguities. They were patented, right? Very important. Because if you look at Heritage's opening brief, and I ask that you do so, if you look at issue number one, issue number one talks about a latent ambiguity. The opening sentence of their summary of argument is that there was a latent ambiguity. And if you look in their summary of facts as to the description of how the dispute arose, they said the parties eventually came to a disagreement on the compensation issue, which was a latent ambiguity. Now why, why, one would ask, and by the way, they used the term latent ambiguity seven times, I think, in their opening brief. So the question is why would Heritage choose to ignore the arbitrator's use of, description of the activity as patent, and characterize it as latent? And I'll tell you, I would suggest to you that they were trying to get within the framework of Colfax. So they, they would hope that this court is going to take Colfax, who, that only makes sense in the, as a latent ambiguity case. They were trying to shoehorn this case into the Colfax reasoning by Judge Posner in order, because in a latent ambiguity, you have a higher, higher probability that the dispute will go to the essence of the contract. The ambiguity will go to the essence of the contract, which then becomes the basis for a determination that either the contract has to be rescinded or, as imperialists, no contract was ever formed, in fact. So it's very important to understand that distinction, and as to understand what Heritage is asking here, Heritage is asking this court to take Judge, the judge's statement as to latent ambiguity. The other stuff, the other material relating dependent ambiguity are really Judge Posner's musings. They weren't holding. And so they're trying to take this case, which, by the way, is uncertain at best. By the way, there are two concurrences there. So you tell me, what's the authority of a case written by a single judge with two concurrences? I'm not sure that has a lot of throw weight, and in fact, you will find, interesting to note, that Colfax has never, underline never, as far as we are able to ascertain, ever been cited in any Texas case, and by the way, this is a Texas law case, and nor has it been cited in any Fifth Circuit case, not been cited in any, as far as we can determine. So what does that tell you? So they're asking a Seventh Circuit uncertain opinion to trump this circuit's rule in Will Drill, this circuit's rule in Bank One, and no less than the U.S. Supreme Court's clear and unequivocal holding at Granite Rock. It's really important here to understand, you asked a very important question about the interpretation of a contract. Courts and arbitrators are called on all the time, all the time, to resolve contract differences. There wouldn't be a contract suit unless somebody had a difference of opinion about the meaning of a term. But what do you say about all the testimony about ships passing in the night? But that's only, but that's exactly the ambiguity. You and I have a contract that's 96 pages long. It's got a lot of stuff that's been substantially performed, and guess what? We have, it's important to understand, the ship isn't passing. Well, if you go to the, if you have a question about the essential price of the item to be bargained for, and parties don't actually agree, then there is no meeting of the minds. But that's not what happened here. Understand that's not what happened here. The parties bargained for the payment of a commission with a minimum of $900,000 and a maximum of $4.9 million. And in fact, in fact, the record evidence submitted to the arbitrator showed that Heritage agreed that even if its interpretation of the contract was applied, we would have been paid $2 million. They take strong issues. Well, I have record sites to support each of those, and if time permits, I'll give you the record sites. They're in, the record sites are in our brief, but I also have them here. There should not be, there's testimony from the CEO. How much was OMG paid by Heritage during the course of whatever this thing is, a contract or not? How much was paid? I think less than, I would guess less than $500,000. I think it said that $140,000 was held in escrow. I don't know how much was actually paid. I don't, I'm not familiar, it's not a detail that I had focused on, but because the fact is that the contract was substantially, had been, was substantially underway, and you're asking why can't you give it back? Once Heritage was allowed to take over the auction in New York, it went on the map for high-end arms and armor auctions. It was a non-player. Greg Martin was the player in this field. It was a big deal when he got acquired, made this transaction with him. Could I come back, if I could, because I've spent time on questions there. There is one case. Is Martin still selling? What? Is Martin still selling? Martin is still, he's still in the antique arms, the arms of business, but is mostly engaging in private transaction because of his reputation now, but his business is gone. I mean, you don't recover from the transfer of your asset with your name. If I could bring the Court's attention that I think is very pertinent, Your Honors, to a question you asked about contract interpretation, what happens? Everybody was talking about ships passing and no meeting in the mines. What was your client doing all this time, just sitting there thinking, oh, the ships are passing, all right, not saying, oh, I think it's clear. There was, all the terms we're describing was a disagreement about two issues, did Martin have to procure the materials in order to earn his commission? It wasn't that, if you were to tell me there was nothing in the agreement about commission, I could understand that ships passing in the night that goes to the essence of the agreement. This is a ships passing in the night that goes to a relatively small ambiguity, a patent ambiguity, not a latent ambiguity. So that's what courts and arbitrators do. When parties disagree about a term, each side could assert, gee, there was no meeting in the mines. And that's exactly, understand what happened here. And I will get to a case that speaks precisely to this behavior. They said, Heritage says we're right on our interpretation, but if we're wrong, then there is a mistake, or no meeting in the mines, and therefore we get to resume. That's called heads I win, tails you lose. If I could draw the court's attention to a Fifth Circuit case that, in my view, anticipated, almost anticipated the facts presented in this case, United Paper, and I came across this in response to a reply brief point that essentially, United Paper Workers International v. Champion, 908 Fed Second, 1252, a 1990 decision by Judge Smith, and significantly, and I would draw your attention initially to footnote seven, in which I will quote, while the parties' subjective understandings as to which was reflected in their agreement may have differed, to say that the contract embodied neither of these understandings defeats the intent of the parties, defeats the intent of the parties. So understand what courts do. Courts don't say, oh, gee, I'm going to punt. You guys disagree. No, and you're charged with responsibility in the area of patent ambiguities, which is why Heritage called this a latent ambiguity. You're charged with the responsibility of resolving them through the evidence and coming down with a ruling, and in this case, again, if you look at footnote 11 in that case, in the instant case of failure of meeting of the minds, ooh, magic word, that doesn't mean contract's over. In the instant case of failure of meeting of the minds could operate to nullify any attempt to interpret how the contract addresses the issue of whether the retiree, in this case, a premium changes under medical part B were anticipated by the parties, but a failure of the minds to meet will not, this is your point about ships passing in the night, but a failure of the minds to meet will not operate to make the entire contract void from the inception. So when a party seeks, says, by the way, if I'm right, then there must have been a mistake and I want rescission, that is not notice that no contract has been formed. What you did not hear, you did not hear discussed here today was the fact that the arbitrator said no contract was formed. It never existed. Well if the contract never formed, it never existed, there was no basis for his arbitrable authority in the first place. He did kill his own authority through that ruling, and that's what the Supreme Court and the Fifth Circuit has held consistently. How did he rationalize the payment of the agreed upon commission on the fine collection? Because it was the contract, because there was no dispute. Because the contract said how much would be paid, right? Absolutely right. I mean it wasn't a quantum merit deal. Oh no, absolutely not. Because that's what you do. You know, quantum merit is only, I've been down this road before, if there's no contract then a party has a quantum merit claim and normally if you're going to rescind the contract then you get quantum merit for services rendered, but he didn't go at it that way. Correct. I mean he didn't. So what he should have done, according to Judge Smith, I mean this is a roadmap. I mean clearly Posner didn't read this. But that's not a roadmap that reverses an arbitration decision, is it? But it's a roadmap that absolutely gives you an indication of why we had no notice, there was no consent, no waiver to the contract formation issue simply by saying, gee, if our interpretation's not accepted, we ask for rescission. And the other part is on that point, remember the other agreement. I understand. Just please remember that the other, they didn't seek to rescind the entire agreement. Only a portion of it. And we're supposed to be on notice that contract formation was at issue? Thank you for your time. All right. Mr. Bair. I can't address the case that Mr. Main just brought up. It's not in his briefs. He didn't file a Rule 28J letter, so I don't have anything to say about that. But I do want to make a few quick points. First, this distinction between patent ambiguity, thank you, and latent ambiguity, it doesn't matter. Because if you read the Colfax opinion, it says it's still going to come out the same way because there's a meeting of the minds on the issue of are we going to arbitrate. I accept Judge Posner's brilliance, but Hornbook law differentiates the two. And I may not remember exactly how, but they're not the same thing. But in his opinion, he's making this distinction that, and we've already discussed the prime of paint, that you have to look at the agreement to arbitrate separately. Second point I'd like— If they agreed to arbitrate, then whatever the kind of ambiguity it was, which can be an important distinction, is for the arbitrator to address. Precisely. Better said than I said it. Mr. Main rattled off a couple of cases. Will Drill is what we call a gateway case. It was a case where eight of forty parties never signed the contract at all. And so, at the outset of the case, there was a determination of whether or not it should be arbitrated or not. Did those eight parties go all the way through arbitration and then— No. No. That's my point, is why is everybody not running to the courthouse first? Well, that's because it wasn't—it didn't come—I mean, did you actually make an oral argument about rescission before the arbitrator at what—or did that just emerge in his final opinion? No. He didn't have us do oral arguments. Instead, he had us do post-hearing briefs, and we did briefs back and forth. My point is— Did you make this argument? Yes, I did. Yes, I did. And how much— And they responded. I'm sure they did. But, I mean, how much of your argument was that? In other words, is that a throw—I mean, because it is a little odd that your final filing sued, you're seeking arbitration, you're pushing your interpretation, and you say you don't—there's a binary—one side said a binary choice. Well, the binary choice was, was merchandise including Remington statues or does it not? And you could have put expert testimony on, maybe you did, but that's the binary choice I see. I don't see a normal binary choice as, you know, heads we win, tails you lose, because there ain't nothing. It wasn't heads I win, tails you lose. That's the point. It was two different parties who had two completely different views of the outset, what those words meant, what they were agreeing to. They didn't understand that the other didn't understand the other's position. And that was very clear from the testimony of Mr. Maine's witnesses. They admitted that they didn't understand that there was this ship's passing in the night, that, you know, they didn't know about it. I want to talk about the practical impact of all this for a second. What was the arbitrator supposed to do? He hears all this evidence, he considers the ambiguity, he determines that it's ambiguous, he sees that he cannot determine the issue on a non-arbitrary basis. What was he supposed to do? I guess OMG is saying he should have said, time out, we're done, I can't do anything further, go to court. Yeah, we've invested six months in this, yeah, we had this eight-day hearing, yes, I've read 300 pages of briefs, sorry. That's not how it should have worked. Well, he gives the money back and says go to court. Well, that would have been a rescission. Are you disputing that the other side would have gotten over $2 million in commissions if your view of how to interpret the contract . . . We absolutely dispute that. We absolutely dispute that, and in fact, we made the point in our reply brief that when they said that in their brief, they don't cite to the record, they cite to one of their briefs. They're confused by testimony that my client gave where he was being asked questions, assuming that they had performed, what was the range of potential damages? How much would they have received? How much would you have received? Would you say everything that you originally contended would be owed under your view of the world? Yes, with one exception. We withheld $150,000 saying that we thought they were going to owe us money. The arbitrator disagreed and said pay him the $150,000, and we paid it. You've paid everything that under your view of what the contract meant was owed. That is correct. And the Bank One case held that the parties could not arbitrate because the contract was unconscionable, right? That's correct, under Mississippi law, so we don't think that applies at all here. Well, it applies for a principal, though, doesn't it? Well, there was no suggestion in our case that the arbitration clause was unconscionable. I want that to be my point. I thought it said the contract was unconscionable. I'm sorry, you're right. Okay, I understand. And that's my final point, that no one contested arbitration, no one contested the arbitration clause. Thank you. All right.